# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

## CONCISE SUMMARY OF THE CASE

Pursuant to 3rd Cir. LAR 33.3, counsel are required to file a concise summary of the case within **14** days of the date of docketing of the Notice of Appeal. Total statement is limited to no more than 2 pages, single-spaced. Counsel may utilize this form or attach a 2 page statement encompassing the information required by this form.

SHORT
CAPTION:_____

USCA NO.: _____

LOWER COURT or AGENCY and DOCKET NUMBER:
_____

NAME OF
JUDGE:_____

Specify who is suing whom, for what, and the subject of this action. Identify (1) the nature of the action; (2) the parties to this appeal; (3) the amount in controversy or other relief involved; and (4) the judgment or other action in the lower court or agency from which this action is taken:




LIST and **ATTACH** a copy of each order, judgment, decision or opinion which is involved in this appeal. If the order(s) or opinion(s) being appealed adopt, affirm, or otherwise refer to the report and recommendation of a magistrate judge or the decision of a bankruptcy judge, the report and recommendation or decision shall also be attached.

Provide a short statement of the factual and procedural background, which you consider important to this appeal:

Appellant Greene, beyond being the District Attorney for Warren County, is a responsible, law-abiding, peaceable individual sought and obtained a Pennsylvania Medical Marijuana ID card ("MMID"), pursuant to Pennsylvania's Medical Marijuana Act, 35 P.S. § 10231.101, et seq and as a result, the Appellees contend he is prohibited from purchasing, possessing and utilizing firearms and ammunition, pursuant to 18 U.S.C. § 922(g)(3). Appellant Irey is a responsible, law-abiding, peaceable individual who, beyond previously honorably serving this Country in the United States Army, lawfully owns and possesses firearms and ammunition and would obtain a MMID but for Appellees' enforcement of § 922(g)(3). Second Amendment Foundation, in conjunction with Greene and Irey, brought the underlying action on behalf of its members who possess MMIDs and use medical marijuana for treatment, including Plaintiff Greene, who would purchase, possess, and utilize firearms and ammunition, and its members, including Plaintiff Irey, who possess firearms and ammunition, and would apply for a MMID and use medical marijuana for treatment, but for Appellees' enforcement of the challenged laws including criminal penalties and loss of liberty and property.

The District Court dismissed the complaint, without leave to amend.

Identify the issues to be raised on appeal:

Whether, as-applied to Greene, Irey and Second Amendment Foundation's similarly situated members, 18 U.S.C. § 922(g)(3) violates the Second Amendment.

This is to certify that this Concise Summary of the Case was electronically filed with the Clerk of the U.S. Court of Appeals for the Third Circuit and a copy hereof served to each party or their counsel of record

this 15 day of July ,20 25 .

/s/ Joshua Prince

Signature of Counsel

Rev. 07/2015

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT GREENE, *et al.*,              )
                                      )
            Plaintiffs,  )   Civil Action No. 1:24-00021
                                      )
v.                                    )   Judge Cathy Bissoon
                                      )
PAMELA BONDI, *et al.*,               )
                                      )
            Defendants.[1] )

**MEMORANDUM OPINION AND ORDER**

**I. MEMORANDUM**

For the reasons stated below, Defendants' Motion to Dismiss (Doc. 32) will be granted in part and denied in part.

**A. Procedural Background**

Plaintiffs, Robert Greene ("Greene"), James Irey ("Irey") and the Second Amendment Foundation ("SAF") (collectively "Plaintiffs") filed a First Amended Complaint (Doc. 7) on March 6, 2024, against Defendants Pamela Bondi, Attorney General of the United States, Steven M. Dettelbach, Director, Bureau of Alcohol, Tobacco, Firearms and Explosives, Kash Patel, Director of the Federal Bureau of Investigation and the United States of America (collectively "Defendants"), seeking a declaration that 18 U.S.C. §§ 922(g)(3) and (d)(3) are unconstitutional both facially and as applied to Plaintiffs and SAF's similarly situated members. Specifically, Plaintiffs contend that Defendants' enforcement of these statutory provisions violates their

---

[1] The First Amended Complaint named Merrick B. Garland, then the Attorney General of the United States, and Christopher Wray, then Director of the FBI. Pamela Bondi since has become Attorney General and Kash Patel since has been named Director of the FBI; thus, both automatically are substituted as defendants. Fed. R. Civ. P. 25(d).

Second Amendment rights by (1) precluding their ability to purchase, possess and utilize firearms and ammunition, if they hold a Medical Marijuana Identification Card ("MMID") and use medical marijuana for treatment pursuant to Pennsylvania law; and/or (2) precluding their ability to retain possession of and utilize firearms and ammunition if they wish to obtain an MMID.

On March 19, 2024, Plaintiffs filed a Motion for Preliminary Injunction (Doc. 11) seeking to enjoin Defendants' enforcement of 18 U.S.C. §§ 922(g)(3), (d)(3) and all related laws, regulations, policies and procedures, including, but not limited to 27 C.F.R. §§ 478.32(a)(3) and (d)(3). On September 10, 2024, this Court denied the Motion for Preliminary Injunction, finding, *inter alia*, that Plaintiffs failed to demonstrate irreparable harm. (Doc. 29).

On October 1, 2024, Defendants filed the instant Motion to Dismiss the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. (Doc. 32). The Motion also seeks to dismiss Plaintiff SAF for lack of standing pursuant to Rule 12(b)(1). Id. The parties have fully briefed the issues, and the Motion is ripe for review.

**B. Factual Background**

Unless otherwise stated, the facts are as set forth in Plaintiffs' First Amended Complaint ("FAC"), and are accepted as true in accordance with Rule 12(b)(6).

Plaintiff Greene is a Pennsylvania resident and the current District Attorney of Warren County. He also is a member of the Second Amendment Foundation. Greene has never been charged with nor convicted of any misdemeanor or felony offense. In May 2023, Greene applied for and obtained a Pennsylvania MMID pursuant to Pennsylvania's Medical Marijuana Act, 35 P.S. § 10231.101, *et seq.*, after being certified by an approved doctor. He presently intends and

2

desires to purchase, possess and utilize firearms and ammunition for self-defense and other lawful purposes, but has refrained from doing so due to Defendants' active enforcement of 18 U.S.C. §§ 922(g)(3), (d)(3) and 27 C.F.R. §§ 478.32(a)(3), (d)(3).  FAC ¶¶ 2, 14, 66-76.

Plaintiff Irey is a Bloomsburg, Pennsylvania resident and a member of the Second Amendment Foundation.  Irey has never been charged with nor convicted of any misdemeanor or felony offense, and he currently lawfully owns and possesses firearms and ammunition.  He previously honorably served the United States in the Army, where he sustained several service-related injuries resulting in a 100% disability rating from the VA.  He has a present intention and desire to obtain a MMID and utilize medical marijuana to treat his symptoms as recommended by a doctor,[2] but has refrained from doing so due to Defendants' active enforcement of 18 U.S.C. §§ 922(g)(3), (d)(3) and 27 C.F.R. §§ 478.32(a)(3), (d)(3).  FAC ¶¶ 3, 15, 78-92.

Plaintiff Second Amendment Foundation ("SAF") is a nonprofit corporation that seeks to preserve the effectiveness of the Second Amendment.  SAF has over 720,000 members and supporters nationwide, including in Pennsylvania, and including Plaintiffs Greene and Irey.  FAC ¶ 16.  SAF seeks relief on behalf of its members who are "similarly situated" to Plaintiffs Greene and Irey.  FAC ¶ 1, 16.  The FAC describes SAF's similarly situated members as those who, like Greene and Irey, are United States citizens; over age 21; not under indictment; never have been convicted of any felony or misdemeanor crime of domestic violence; have never been convicted of any crime punishable by more than one year; not fugitives from justice; not, pursuant to state law, unlawful users of any controlled substance; not addicted to any controlled substance; not been adjudicated as mentally defective or been committed to any mental

---

[2] The FAC states that Irey consulted with a Department of Health Medical Marijuana Approved Practitioner who determined that he met the criteria for participation in Pennsylvania's medical marijuana program due to his chronic pain and associated neuropathy.  FAC ¶ 85 & Exs. C, D.

3

institution; not been discharged from the Armed Forces under dishonorable conditions; never renounced their citizenship; and are not the subject of any restraining order relating to an intimate partner. FAC ¶ 94. SAF's "similarly-situated" members either possess MMIDs and would purchase, possess and utilize firearms and ammunition; or own and possess firearms and ammunition and would apply for a MMID and use medical marijuana for treatment pursuant to Pennsylvania law, but for Defendants' enforcement of the challenged provisions. FAC ¶¶ 95-102.

**C. Challenged Laws and Regulations**

Marijuana currently is listed in the Controlled Substances Act (18 U.S.C. § 801 *et seq.*) ("CSA") as a Schedule I controlled substance. 18 U.S.C. § 922(d)(3) provides that "[i]t shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person, including as a juvenile … is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))." 18 U.S.C. § 922(g)(3) provides that "[i]t shall be unlawful for any person … who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

27 C.F.R. § 478.11 provides, in relevant part:

> *Unlawful user of or addicted to any controlled substance.* A person who uses a controlled substance and has lost the power of self-control with reference to the use of controlled substance; and any person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician. Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before, but rather that the unlawful use has occurred recently enough to indicate that the individual is actively

4

engaged in such conduct. A person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person seeks to acquire a firearm or receives or possesses a firearm. An inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time, e.g., a conviction for use or possession of a controlled substance within the past year; multiple arrests for such offenses within the past 5 years if the most recent arrest occurred within the past year; or persons found through a drug test to use a controlled substance unlawfully, provided that the test was administered within the past year. For a current or former member of the Armed Forces, an inference of current use may be drawn from recent disciplinary or other administrative action based on confirmed drug use, e.g., court-martial conviction, nonjudicial punishment, or an administrative discharge based on drug use or drug rehabilitation failure.

ATF also has promulgated a regulation stating that no person may ship, receive, or possess a firearm in interstate or foreign commerce who is an unlawful user of or addicted to any controlled substance as defined in the CSA, 27 C.F.R. § 478.32(a)(3), or transfer a firearm to a person knowing or having reasonable cause to believe that such a person is an unlawful user of, or addicted to, any controlled substance as defined in the CSA, 27 C.F.R. § 478.32(d)(3).

The ATF's Form 4473, which is required to be executed by any individual seeking to purchase a firearm from a federal firearms licensee ("FFL") or have a firearm transferred to him/her from an FFL, consistent with the aforementioned laws and regulations, asks the transferee/buyer in question 21.f., "[a]re you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance?" and immediately thereafter provides: "**Warning**: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside." *See* FAC ¶¶ 50-57 & n.16.[3]

---

[3] The ATF 4473 Form has been revised, several times, since issuance of the September 21, 2011 Open Letter and, as a result, the question has been moved from question 11.e. to question 21.f.

5

ATF's Open Letter of September 21, 2011, declares, *inter alia*, that if an FFL is "aware that the potential transferee is in possession of a card authorizing the possession and use of marijuana under State law, then you have 'reasonable cause to believe' that the person is an unlawful user of a controlled substance. As such, you may not transfer firearms or ammunition to the person, even if the person answered 'no' to question [21.f.] on the ATF Form 4473." FAC ¶ 49 & n.14.

In each fiscal year since 2015, Congress has included provisions in appropriations acts that prohibit the DOJ from using appropriated funds to prevent certain states and territories, along with the District of Columbia, from "implementing their own laws that authorize the use, distribution, possession or cultivation of medical marijuana." FAC ¶¶ 46-48 & n.13 (the "Rohrabacher-Farr Amendment").

The sole count of the First Amended Complaint asserts that 18 U.S.C. §§ 922(g)(3) and (d)(3), and all related laws, regulations, policies and procedures ("challenged provisions") are unconstitutional facially and as-applied to Plaintiffs pursuant to the Second Amendment. FAC ¶¶ 103-115. Plaintiffs seek declaratory and injunctive relief.

**D.  Analysis**

    **1.  Legal Framework**

Although modern Second Amendment jurisprudence is rapidly evolving, the following framework reflects the current legal landscape in the Third Circuit.

As the Court of Appeals recently summarized, "The Second Amendment, controversial in interpretation of late, is simple in its text: 'A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed.'" Lara v. Comm'r Pennsylvania State Police, 125 F.4th 428, 433 (3d Cir. 2025) (citing U.S. Const.

amend. II). In District of Columbia v. Heller, the Supreme Court held that, while the Second Amendment "'confer[s] an individual right to keep and bear arms' for traditionally lawful purposes, such as self-defense within the home[,]" that right "is not unlimited." United States v. Quailes, 126 F.4th 215, 219 (3d Cir. 2025) (quoting Heller, 554 U.S. 570, 595, 626, 629 (2008)), *petition for cert. filed*. Apr. 18, 2025.

Prior to 2022, courts within this Circuit applied a "means-end scrutiny" analysis in Second Amendment cases. See Lara, 125 F.4th at 433 & n.9 (citing cases). In New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022), however, the Supreme Court upended this jurisprudence and announced a new, two-step analysis. Now, courts first must determine whether "the Second Amendment's plain text covers an individual's conduct." Lara, 125 F.4th at 434 (quoting Bruen, 597 U.S. at 19). "If the text applies to the conduct at issue, 'the Constitution presumptively protects that conduct.'" Id. (quoting Bruen, 597 U.S. at 24). Second, the court must determine "whether the law in question 'is consistent with the Nation's historical tradition of firearm regulation.' If it is, the presumption made at the first step of Bruen is overcome, and the restriction in question can stand." Id. At this second step, "the Government bears the burden of identifying a 'founding-era' historical analogue to the modern firearm regulation." Id. (quoting Bruen, 597 U.S. at 24-27). "The question is 'whether historical precedent from before, during, and even after the founding evinces a comparable tradition of regulation.'" Id. (quoting Bruen, 597 U.S. at 27); *see also* Heller, 554 U.S. at 634-35. The Court of Appeals has cautioned, however, that, in considering historical precedent, courts must "discount '[h]istorical evidence that long predates' 1791 and 'guard against giving postenactment history more weight than it can rightly bear.'" Lara, 125 F.4th at 434 (quoting Bruen, 597 U.S. at 34-35).

7

During the pendency of the instant case, the Supreme Court applied Bruen in United States v. Rahimi, 602 U.S. 680 (2024), to uphold as constitutional a different subsection of the statute at issue – 922(g)(8) – which restricts the firearm possession of individuals subject to a domestic violence restraining order.  The Court in Rahimi noted that some lower courts had "misunderstood the methodology" of its recent Second Amendment cases and clarified that "[t]hese precedents were not meant to suggest a law trapped in amber." Rahimi, 602 U.S. at 691; see also id. at 691-92 ("[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791.  Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers."); id. at 692 (reiterating that the step two analysis requires courts to "ascertain whether the new law is 'relevantly similar' to laws our tradition is understood to permit, apply[ing] faithfully the balance struck by the founding generation to modern circumstances" (internal quotations omitted)).

The Court further emphasized that "*[w]hy and how* the regulation burdens the right are central to this inquiry." Id. (emphasis added).  Thus:

> if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations.  Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.  And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster." [Bruen, 597 U.S.] at 30.  The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin." Ibid. (emphasis deleted).

Id. at 692; see also Quailes, 126 F.4th at 220 ("Rather than seeking out a perfect statutory analogue, 'dead ringer,' or 'historical twin,'. . . we draw on 'relevantly similar' historical regulations to derive 'principles underlying the Second Amendment' and then ask if the modern-

day regulation 'comport[s] with th[ose] principles' in terms of 'why and how it burdens the Second Amendment right.'" (quoting Rahimi, 602 U.S. at 692)).

Applying this framework, the Rahimi Court held that Section 922(g)(8) "fit[s] 'comfortably' within the Nation's historical tradition of firearm regulation, which, since the founding, has 'included provisions preventing individuals who threaten physical harm to others from misusing firearms.' The Court also concluded that the statute did not go too far in regulating that conduct, as it disarms an individual only under specific circumstances and for a certain period." Lara, 125 F.4th at 435 (quoting Rahimi, 602 U.S. at 699).

### 2. Plaintiff Second Amendment Foundation Has Associational Standing

An association has standing to bring suit on behalf of its members when (1) its members otherwise would have standing to sue in their own right; (2) the interests the association seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977). The parties agree that SAF satisfies the first two prongs of this test, but the Government argues that the organization cannot meet the third prong because "fact-specific inquiries" are needed to determine which SAF members are "similarly situated" to Plaintiffs Greene and Irey. Def. Br. Supp. (Doc. 33) at 9 (citing cases). The Court disagrees. For the reasons set forth in Plaintiffs' opposition brief, SAF's similarly-situated members are easily ascertainable based on objective criteria. Pl. Br. Opp. (Doc. 39) at 4-5. This is especially true given that Plaintiffs seek only declaratory and injunctive relief.

Accordingly, Defendants' Motion to Dismiss SAF for lack of standing is denied.

### 3. The Challenged Provisions Are Facially Constitutional

Consistent with this Circuit's post-Bruen jurisprudence, it is clear at the first step of the analysis that Plaintiffs Greene and Irey, as adult Americans, are "among 'the people' presumptively protected by the Second Amendment." Quailes, 126 F.4th at 220–21 (internal citations omitted); see also Lara, 125 F.4th at 438-39 (all adult Americans are presumptively among "the people" to who Second Amendment rights extend); United States v. Moore, 111 F.4th 266, 269 (3d Cir. 2024) ("As an adult citizen, Moore is one of the 'people' whom the Second Amendment presumptively protects."); Range v. Att'y Gen. United States ("Range II"), 124 F.4th 218 (3d Cir. 2024) (rejecting the argument that "the people" includes only law-abiding citizens); Heller, 554 U.S. at 580-81 (explaining that "'the people' as used throughout the Constitution unambiguously refers to all members of the political community, not an unspecified subset"). Additionally, the challenged provisions punish "'quintessential Second Amendment conduct' – possession of a firearm." Quailes, 126 F.4th at 220–21 (internal citations omitted); Moore, 111 F.4th at 269 (same).

Having found that the Second Amendment's plain text covers Plaintiffs' conduct, the Government next bears the burden of justifying the challenged provisions by showing that they are "consistent with the Nation's historical tradition of firearm regulation." Id. (quoting Bruen, 597 U.S. at 17). A facial challenge is the "'most difficult challenge to mount successfully,' because it requires the challenger to 'establish that no set of circumstances exists under which the Act would be valid.'" Rahimi, 602 U.S. at 693 (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). "That means to prevail, the Government need only demonstrate that [the challenged provisions are] constitutional in some of [their] applications." Id. The Government easily meets this burden here.

In support of their step two argument, the Government points to two historical analogues: (1) laws disarming the intoxicated and (2) laws disarming "those deemed dangerous." *See* Def. Br. Supp. at 19-31. First, the Government cites to several founding-generation laws aimed at separating firearms and alcohol such as a 1658 Massachusetts law that permitted constables to apprehend those "overtaken with drink" and keep them "in close custody" until brought before the magistrate; a 1655 Virginia law prohibiting the shooting of guns at "drinking events"; a 1771 New York law that barred firing guns during New Year's to prevent "great Damages" done on that holiday by persons "often intoxicated with Liquor"; and a 1731 Rhode Island law forbidding the firing of guns in taverns at night. *See* id. at 19-20 (providing citations). The Government also cites examples of laws restricting firearms access for intoxicated militia members that persisted into the 19th century, including 1837 and 1844 laws from three states excluding "common drunkards" from the militia entirely. *See* id. at 20 (providing citations).

Focusing on the "why" and "how" the challenged provisions impose a "comparable burden" that is "comparably justified" to historical intoxication statutes, the Government argues that, like the intoxication statutes, the challenged provisions limit firearm use at times an individual is deemed unlikely to use them responsibly ("why") and impose merely a *temporary* restriction on possession or receipt that lasts only during the period the individual is deemed unlikely to use firearms responsibly ("how"). *See* id. at 21-24.

Second, the Government argues that historical "laws disarming those deemed dangerous also justify the challenged provisions." Id. at 25-31. Among these are laws restricting possession of firearms by the "mentally ill." *See* id. at 27-30 (providing citations). Again focusing on the "why" and "how", the challenged provisions are consistent with the principle that the legislature may disarm categories of people it deems dangerous with firearms. *See*

11

Rahimi, 602 U.S. at 698 ("[W]e do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse."). Like the historical laws disarming the mentally ill, the challenged provisions align with the principle of keeping guns away from dangerous people, including people rendered dangerous by conditions that impair one's mental state. In terms of "how," the challenged regulations are even less restrictive than historical laws disarming the mentally ill because the challenged provisions only impose a temporary prohibition that ends if and when the individual chooses to end their unlawful drug use. *See* United States v. Yancey, 621 F.3d 681, 686 (7th Cir. 2010) (Section 922(g)(3) is "far less onerous" than provisions imposing lifetime firearms bans because " an unlawful drug user like Yancey could regain his right to possess a firearm simply by ending his drug abuse.").[4]

After careful consideration, the Court agrees that the Government has shown that Sections 922(g)(3) and (d)(3) are "relevantly similar" to historical regulations aimed at preventing potentially dangerous persons from possessing and using firearms, including the mentally ill and the intoxicated. Although the Court of Appeals for the Third Circuit has not yet addressed directly the provisions challenged here, this finding is consistent with the overwhelming weight of authority upholding the facial constitutionality of Sections 922(g)(3) and/or (d)(3) and related regulations. *See* Def. Br. Supp. (Doc. 33) at 11-13 & n.8 (citing cases); *see also* United States v. Biden, 733 F. Supp. 3d 331, 336-37 (D. Del. 2024) (citing cases),

---

[4] The Court notes that Yancey is a post-Heller, but pre-Bruen, decision, and, thus, "some aspects of that court's analytical approach to the Second Amendment issues (*e.g.*, validation by looking for a substantial relation to an important governmental objective) are not entirely aligned with the approach now required by Bruen." Those differences do not affect the pertinence of the quoted material. United States v. Lewis, 650 F. Supp. 3d 1235, 1242 (W.D. Okla. 2023), *appeal filed* July 22, 2024.

*appeal dismissed*, 2024 WL 4802266 (3d Cir. May 28, 2024); Fried v. Garland, 640 F. Supp. 3d 1252 (N.D. Fla. 2022), *appeal pending* at No. 22-13893.

Even courts that have sustained or entertained an *as-applied* challenge to Section 922(g)(3) have had little trouble concluding that the statute is *facially* valid. *See, e.g.*, United States v. Connelly, 117 F.4th 269, 282 (5th Cir. 2024) ("[O]ur history and tradition of firearms regulation show that there are indeed some sets of circumstances where § 922(g)(3) would be valid, such as banning presently intoxicated persons from carrying weapons. . . . Because there are at least some circumstances where § 922(g)(3) is constitutional, [the] facial challenge fails."); United States v. Daniels, 124 F.4th 967, 974–75 (5th Cir. 2025) ("[Section] 922(g)(3) is not facially unconstitutional, because our history can support gun regulations disarming the presently intoxicated."); United States v. Veasley, 98 F.4th 906, 912-13 (8th Cir.), cert. denied, 145 S. Ct. 304 (2024) (noting that, although mental illness and drug use are not the same thing, "there is an intuitive similarity because their behavioral effects overlap" and that "[t]he fact that the analogy works for some, and that the mentally ill sometimes lost their guns, means that § 922(g)(3) cannot be facially unconstitutional"); *see also* Connelly, 117 F.4th at 283 ("[T]he historical evidence that supports § 922(g)(3)'s facial constitutionality supports § 922(d)(3)'s too. . . . Because there are at least some instances where § 922(d)(3) may be constitutionally applied, [the] facial challenge fails.").

The Court finds in Plaintiffs' counterarguments nothing that would counsel a contrary result here. Indeed, Plaintiffs cannot meaningfully dispute the point and themselves concede that the Government may restrict gun use when one is under the influence. *See* Pl. Br. Opp. (Doc. 39) at 11 n.8.

13

Consistent with the overwhelming weight of persuasive authority upholding the challenged provisions as facially valid, the Court grants the Government's motion to dismiss Plaintiffs' facial challenge.

**4. The Challenged Provisions Are Constitutional As-Applied**

The Court further finds that the challenged provisions also are constitutional as applied to individuals such as Plaintiffs who do not unlawfully use, or desire to use, controlled substances other than medical marijuana and otherwise are non-violent and law-abiding.

In Fried v. Garland, 640 F. Supp. 3d 1252 (N.D. Fla. 2022), the district court upheld the challenged provisions against a materially identical as-applied challenge. The individual plaintiffs in Fried included two individuals who participated in Florida's medical marijuana program and wanted to purchase firearms for personal protection; and a Florida resident and gun owner with a qualifying medical condition who wanted to participate in Florida's medical marijuana program but was not using marijuana because his gun ownership would expose him to prosecution under the challenged provisions. Id. at 1256. Defendants included the Attorney General, the ATF Director and the United States. Id.

In upholding the constitutionality of the challenged provisions, the court examined similar historical analogues including the tradition of keeping firearms from those whose possession of firearms the government deems dangerous. Id. at 1262. The Fried court rejected Plaintiffs' argument that their situations were not analogous because they were not "dangerous" – at least when they were not under the influence. Pointing to the same intoxication statutes and laws keeping guns from the mentally ill as the Government here, the court found that the tradition of restricting firearms rights on the basis of intoxication (prohibiting possession while impaired) and the tradition of disarming groups that would be dangerous with firearms such as

14

the mentally ill justify applying the challenged provisions to medical marijuana users even during periods when they were not under the influence. See id. at 1263 ("Although the prohibition reaches those habitually using marijuana (even if not currently under the influence), habitual drug users are analogous to other groups the government has historically found too dangerous to have guns."); id. at 1262-63 ("Congress enacted the exclusions in section 922(g) to keep guns out of the hands of presumptively risky people." (quoting Yancey, 621 F.3d at 683)); see also Def. Br. Supp. (Doc. 33) at 32-33 (citing medical marijuana informed consent forms outlining the significant mental and physical impairments caused by even medical marijuana use).

The Government also correctly notes that the application of the challenged provisions to Plaintiffs is consistent with "the tradition of disarming those engaged in criminal conduct." Def. Br. Supp. at 33-34 (citing Fried, 640 F. Supp. 3d at 1260). It is undisputed that, despite what any state law might say, marijuana remains a Class I controlled substance and that marijuana possession remains a federal crime This further supports the conclusion that Congress's determination that it would be dangerous to allow marijuana users – including medical marijuana users – to have access to firearms is constitutional as applied to Plaintiffs. As the Government observes, Plaintiffs in this case are not like the criminal defendant in Range who had been disarmed for life based on a single conviction for food stamp fraud in the 1990s and thus faced prospective disarmament for past criminal behavior. Rather, this is a civil case involving Plaintiffs who essentially seek *carte blanche* permission to presently commit the federal crime of unlawful possession and/or use of a controlled substance while, at the same time, possessing firearms. Such logic defies common sense. See Fried, 640 F. Supp. 3d at 1262 (noting the historical tradition of keeping guns from law violators and stating that "[r]egardless of how

15

marijuana laws are now enforced, the fact remains that Congress considered marijuana possession serious business. It determined that marijuana is harmful, with 'a high potential for abuse'").[5]

Having shown "why" the identified modern and historical regulations are comparably justified, the "how" also fits. Indeed, the challenged provisions are no more – and in some cases less – onerous than the historical traditions of disarming the intoxicated, the mentally ill or other dangerous individuals. Rather than imposing a permanent ban, the challenged provisions prohibit gun ownership or possession only while one is "a current user of a controlled substance." Fried 640 F. Supp. 3d at 1262 (citing 27 C.F.R. 478.11).[6] Plaintiffs have no constitutional right to use marijuana – medical or otherwise, and there are no allegations that medical marijuana is the only available treatment for their medical conditions. Plaintiff Irey already possesses numerous firearms and can retain them by simply choosing an alternative treatment. Plaintiff Greene can purchase and possess firearms if he stops participating in the

---

[5] Contrary to Plaintiffs' counterarguments, the Rohrabacher-Farr Amendment does not effectively "legalize medical marijuana" or remove marijuana from the schedules of controlled substances. Rather, this appropriations restriction simply temporarily restricts the DOJ from spending appropriated funds to prevent states from implementing medical marijuana laws. Nothing in the provision changes the fact that marijuana remains a schedule I drug and that possession of marijuana violates federal law. See Fried, 640 F. Supp. 3d at 1260-61; Def. Reply Br. (Doc. 41) at 9-10.

[6] Plaintiffs' argument that Section 478.11 somehow negates the temporary nature of the firearms deprivation is strained. Contrary to Plaintiffs' assertion, Section 478.11 does not prohibit an individual from purchasing, possessing or utilizing firearms or ammunition for one year after last use. Rather, in defining an unlawful user of a controlled substance, it states merely that "[a]n inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time, e.g., a conviction for use or possession of a controlled substance within the past year." 27 C.F.R. 478.11. Such inference is, by its terms, permissive and nothing in the definition suggests that it would preclude an otherwise valid finding that a person is no longer an unlawful drug user.

medical marijuana program. Choosing to refrain from engaging in federally unlawful behavior is not a burdensome ask.

Consistent with Fried, which the Court finds persuasive, and the additional authority cited above, the Court grants the Government's motion to dismiss Plaintiffs' as-applied challenge.[7] Because the Court's decision rests primarily on legal conclusions and not on insufficient factual allegations, it finds that further amendment would be futile.

In accordance with the foregoing, the Court hereby enters the following:

### ORDER

Defendants' Motion to Dismiss (**Doc. 32**) is **GRANTED IN PART AND DENIED IN PART**. The Motion to Dismiss Plaintiff Second Amendment Foundation for lack of standing is **DENIED**. The Motion to Dismiss for Failure to State a Claim is **GRANTED**. The First Amended Complaint is HEREBY DISMISSED WITH PREJUDICE, and this case will be marked CLOSED.

IT IS SO ORDERED.

June 30, 2025

s/Cathy Bissoon
Cathy Bissoon
United States District Judge

cc (via ECF email notification):

All Counsel of Record

---

[7] Plaintiffs' citation to the Court of Appeals for the Fifth Circuit's decisions in Connelly and its progeny does not change this conclusion. As an initial matter, Connelly is not binding authority, and the Court declines to follow it here to the extent its reasoning diverges from the authority cited herein. Moreover, Connelly, which dealt with an as-applied challenge in the context of a criminal prosecution, is factually distinguishable from the civil, medical marijuana landscape at issue here.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT GREENE, *et al.*, | ) | |
| Plaintiffs, | ) | Civil Action No. 1:24-00021 |
| v. | ) | Judge Cathy Bissoon |
| PAMELA BONDI, *et al.*, | ) | |
| Defendants.[1] | ) | |

# JUDGMENT ORDER

FINAL JUDGMENT hereby is entered pursuant to Rule 58 of the Federal Rules of Civil Procedure. This case has been marked closed.

IT IS SO ORDERED.

June 30, 2025

s/Cathy Bissoon
Cathy Bissoon
United States District Judge

cc (via ECF email notification):

All Counsel of Record

---

[1] The First Amended Complaint named Merrick B. Garland, then the Attorney General of the United States, and Christopher Wray, then Director of the FBI. Pamela Bondi since has become Attorney General and Kash Patel since has been named Director of the FBI; thus, both automatically are substituted as defendants. Fed. R. Civ. P. 25(d).